UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,                          Case No. 13-12520

        Plaintiff,                            Honorable Nancy G. Edmunds

v.

MAYFIELDGENTRY REALTY ADVISORS,
LLC, ET AL,

        Defendants.
_____/

## OPINION AND ORDER DENYING  DEFENDANTS MATTHEWS'S AND ACKMAN'S MOTIONS TO DISMISS [16, 26]

        This civil matter comes before the Court on Defendants W. Emery Matthews's and

Blair Ackman's motions to dismiss the Securities and Exchange Commission ("SEC")'s

Complaint, arguing alternatively that the Complaint fails to state a claim against them and

any viable claim is time-barred under the relevant five-year statute of limitations.   The

SEC's two-count Complaint alleges that (1) Defendants Mayfieldgentry Realty Advisors,

LLC ("MGRA") and Chauncy Mayfield violated Sections 206(1) and 206(2) of the

Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80b-6(1) and 80b-6(2);

and (2) Defendants Blair Ackman, Marsha Bass, W. Emery Matthews, and Alicia M. Diaz

aided and abetted Defendants MGRA's and Mayfield's violations of §§ 206(1) and 206(2)

and thus violated Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f).  For the reasons

stated below, Defendants' motions are DENIED.

## I.     Background

Until May 2012, MGRA was an investment adviser to the Police and Fire Retirement System of the City of Detroit (the "PFRS") -- a pension fund that manages billions of dollars for the benefit of over 8,300 retirees and over 3,800 active duty members of Detroit's Police and Fire Departments.  (Compl., ¶¶ 2, 7, 13, 21, 23.)  The PFRS was MGRA's largest client, and the vast majority of the compensation earned by MGRA's principals, including Defendants Matthews and Ackman, was directly attributable to fees MGRA charged PFRS. (*Id.* at ¶¶ 3, 70.)

Defendant Mayfield is the founder, President, and CEO of MGRA, a registered investment adviser.  (*Id.* at ¶ 14.)  Mayfield owns 71% of MGRA's stock.  (*Id.*)  Mayfield is also the defendant in a separate SEC enforcement action, *SEC v. Kilpatrick, et al.*, Case No. 12-cv-12109 (E.D. Mich.), which is currently pending.  Based on the alleged misconduct in the SEC action, Defendant Mayfield pled guilty to one count of conspiracy to influence or reward local public officials in violation of 18 U.S.C. §§ 371, 666(a), in *United States v. Beasley, et al.*, No. 12-cr-20030, a pending criminal matter.  (*Id.*)

Defendant Ackman is a certified public accountant.  From October 2006 through June 2012, Ackman was the Chief Financial Officer of MGRA, and he owns 5% of MGRA's stock.  (*Id.* at ¶ 15.)  From 2008 through 2011, on a quarterly basis, Defendant Ackman provided detailed financial reports to PFRS regarding properties owned by it and also regularly gave written notice to PFRS of all funds transferred to and from PFRS's bank accounts.  (*Id.* at ¶ 68.)

From September 2006 through May 2012, Defendant Matthews was the Chief Investment Officer of MGRA, and owns 8% of MGRA's stock.  (*Id.* at ¶ 17.)

In January and February 2008, at the direction of its Chief Executive Officer, Defendant Mayfield, MGRA, without authorization from PFRS or disclosure to PFRS, secretly took $3.1 million out of the PFRS's "Master Account" and used it to buy two shopping centers (the "California Properties") for MGRA. (*Id.* at ¶¶ 43-58.) A reasonable investment advisory client in PFRS's position would have wanted to know that its investment adviser had misappropriated its assets without permission. (*Id.* at ¶ 57.)

In late March 2008, Defendant Ackman reviewed the closing documents from MGRA's purchase of the California Properties and noticed that they did not indicate that PFRS owned the California Properties; MGRA was still listed as the owner. In response to Ackman's inquiries, Mayfield replied that he was looking for high net investors to "take PFRS out of the deal." (*Id.* at ¶¶ 59-61.) Within the next few months, however, the real estate market collapsed and the California Properties lost a significant amount of their value. (*Id.* at 64.) On a regular basis from 2008 through 2011, Defendant Ackman discussed the California Properties with Mayfield. Rather than taking steps to disclose the theft, Defendants Mayfield and Ackman discussed ways of replacing the stolen funds so that the theft would not be disclosed. (*Id.* at ¶¶ 65-67.)

On a quarterly basis from 2008 through 2011, Defendant Ackman provided detailed financial reports to the PFRS regarding properties owned by the PFRS. The financial reports included, among other things, the names of properties MGRA managed on behalf of PFRS; the assets, liabilities, and equity associated with the properties; and the income and expenses associated with the properties. Ackman also regularly gave written notice to PFRS of all funds transferred to and from the PFRS's bank accounts. None of these financial reports or written notices ever included the California Properties or disclosed that

3

MGRA had used $3.1 million of PFRS's money to purchase the California Properties. (*Id.* at ¶ 68.)

In May 2011, Defendants Ackman, Bass, Matthews, and Diaz met to discuss budgeting and cost cutting. Mayfield was not in attendance. At that meeting, the MGRA principals who were present discussed that the $3.1 million used to purchase the California Properties was taken without permission from the PFRS Master Account. They discussed different scenarios for paying back the PFRS, including selling the California Properties and implementing cost-cutting measures. They did not discuss disclosing the theft to PFRS. Rather, they discussed ways to put the $3.1 million back into PFRS's Master Account without PFRS ever discovering the money was missing in the first place. This decision was based on their fear that their client -- PFRS – would fire MGRA upon learning of the theft. (*Id.* at ¶¶ 70-71.) Rather than informing PFRS of the theft, MGRA's principals, Defendants Ackman, Bass, Matthews, Diaz, and Mayfield, engaged in affirmative efforts to conceal the theft from PFRS, including hiring a broker and taking steps to sell the California Properties. The efforts to sell the California Properties were unsuccessful. None of this was disclosed to PFRS. (*Id.* at ¶¶ 72-74.) The MGRA principals continued to discuss cost-cutting measures, including reductions in their substantial salaries. (*Id.* at ¶¶ 75-76.)

On July 14, 2011, Defendants Matthews and Diaz attended a PFRS board meeting and discussed portfolio performance, along with a proposal for a new investment opportunity; and on July 21, 2011, Defendants Matthews and Diaz again appeared at a PFRS board meeting where they discussed performance measurement reporting. They did not discuss the theft or the California Properties at either meeting. (*Id.* at ¶ 78.)

4

As a major investment adviser to PFRS, MGRA made annual budget presentations to the PFRS board. These were critical meetings where MGRA's principals discussed the full scope of MGRA's advisory activities for PFRS and requested continued funding of the assets that MGRA managed on PFRS's behalf. (*Id.* at ¶ 79.)

On December 15, 2011, MGRA made its 2012 budget presentation to the PFRS board. All of MGRA's principals, Defendants Mayfield, Ackman, Bass, Matthews, and Diaz, attended and participated in the meeting. (*Id.* at ¶ 80.) Defendants Diaz and Matthews took part in the presentation at this December 15, 2011 board meeting. (*Id.* at ¶¶ 82-86.) At no point during her presentation did Defendant Diaz discuss the California Properties nor did she mention the difficulties MGRA had been having in selling the California Properties, which had dramatically declined in value since being acquired in 2008. (*Id.* at ¶ 85.) Likewise, when Defendant Matthews solicited and answered questions from PFRS board members, he was asked whether MGRA calculated a "return on investment" for each property or for the entire PFRS portfolio. Matthews explained that MGRA calculated an "internal rate of return" for the PFRS portfolio, stated that it was currently at 6.8%, that it had "exceeded relevant benchmarks," but did not explain that the 6.8% would be materially impacted if it took into account the $3.1 million theft. (*Id.* at ¶¶ 86-88.)

Prior to the meeting, MGRA had provided PFRS with an extremely detailed and voluminous document titled "Police & Fire Retirement System of the City of Detroit -- 2012 Annual Operating Budget" (the "Budget Document"). This Document exhaustively reviewed MGRA's advisory activities on PFRS's behalf, including an asset-by-asset analysis of the portfolio that MGRA managed for it. The Budget Document did not include any mention

5

of the California Properties purchased with the funds stolen from PFRS's bank account. Each of MGRA's principals had a hand in preparing the Document.  (*Id.* at ¶ 81.)

In March 2012, MGRA sold one of the California Properties at a loss to a third party, and the proceeds from the sale were used to pay down the mortgage on the California Properties.  None of the proceeds were returned to PFRS, and PFRS was not informed about the sale.  (*Id.* at ¶ 89.)

In late April 2012, MGRA faxed an undated letter to PFRS disclosing, for the first time, that MGRA used PFRS funds to purchase the California Properties, and that the Properties were never titled to PFRS.  (*Id.* at ¶¶ 90-91.)

On May 3, 2012, PFRS voted to terminate its business relationship with MGRA.  That same day, PFRS delivered a letter to MGRA terminating the PFRS MGRA Advisory Agreement for cause, stating that MGRA's failure to disclose the theft constituted fraud, bad faith, negligence, and a breach of that Agreement.  Shortly thereafter, all of MGRA's other clients terminated their business relationships with MGRA, and MGRA has since transitioned the real estate assets it was managing to other entities and is in the process of winding down its operations.  (*Id.* at ¶¶ 92-93.)

On May 23, 2012, PFRS filed a complaint in state court against MGRA, its principals, and the MGRA limited liability company involved in the purchase of the California Properties.  The state court granted PFRS's motion for a temporary restraining order, and the state-court action is still pending.  (*Id.* at ¶ 94.)

On December 31, 2012, MGRA sold the other California Property to a third party for $1.55 million.  Part of the proceeds of the sale were used to satisfy the outstanding balance on the loan used to finance the original purchase of the California Properties.  Some of the

6

proceeds went to commissions and fees, and the balance -- approximately $1.1 million -- was remitted to PFRS in connection with the state-court action.  (*Id.* at ¶ 95.)

On June 10, 2013, the SEC filed this civil enforcement action alleging that Defendants MGRA and Mayfield violated §§ 206(1) and (2) of the Advisers Act and that Defendants Ackman, Matthews, Diaz, and Bass violated § 209(f) of the Advisers Act by aiding and abetting Defendants MGRA's and Mayfield's violations.

This matter is now before the Court on Defendants Matthews's and Ackman's motion to dismiss.

## II.   Motion to Dismiss Standard

The Sixth Circuit recently noted that under the United States Supreme Court's heightened pleading standard laid out in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a complaint only survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Assoc.,* 714 F.3d 920, 924-25 (6th Cir. 2013) (internal quotations and citations omitted). The court in *Estate of Barney* goes on to state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotations and citations omitted). Furthermore, "[w]hile the plausibility standard is not akin to a 'probability requirement,' the plausibility standard does ask for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  Finally, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P.

7

8(a)(2)).  If the plaintiffs do "not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

## III.   Analysis

### A.  The SEC States A Claim of Aiding and Abetting Under The Advisers Act

Defendants Ackman and Matthews premise their dismissal arguments on the assumption that the securities law violation that they are alleged to have aided and abetted is MGRA's theft of $3.1 million from its advisory client -- the Police and Fire Retirement System of the City of Detroit (the "PFRS") that was completed on February 29, 2008. Flowing from that premise, Defendants first argue that the SEC's aiding and abetting claim against them fails because it is impossible to aid and abet a completed violation.  The SEC responds that it's the coverup, not the theft, that gives rise to the securities law violation that these Defendants are alleged to have aided and abetted.  Rather than the theft, Defendants are alleged to have aided and abetted MGRA's and Mayfield's subsequent breach of their fiduciary duty to disclose material facts to their client, PFRS -- facts about the failed attempts to recoup the misappropriated funds and facts that accurately reflected the value of PFRS's assets.  To counter this, Defendants argue that there is no cause of action under the Advisers Act for aiding and abetting Defendants MGRA's and Mayfield's breach of their fiduciary duty to disclose material facts when that disclosure involves facts that reveal a completed violation of the securities laws, i.e., the alleged February 29, 2008 theft.  Or, as more simply stated by Defendant Ackman, "a nondisclosure of a completed securities law violation does not constitute its own primary and independent securities law violation."  (Def. Ackman's Reply at 6.)  Defendants' arguments are rejected.

8

**1. Defendants MGRA's and Mayfield's Alleged Breach of Fiduciary Duty Constitutes a Violation of §§ 206(1) and 206(2) of Advisers Act**

Taking the allegations in the SEC's Complaint as true, as required when considering a Rule 12(b)(6) motion to dismiss, Defendants Ackman and Matthews are not accused of aiding and abetting Defendants MGRA's and Mayfield's misappropriation of $3.1 million of PFRS's assets in February 2008.   Rather, they are accused of aiding and abetting Defendants MGRA's and Mayfield's violation of §§ 206(1) and 206(2) of the Advisers Act. Specifically, the Complaint alleges that Defendants MGRA (acting through a principal) and Mayfield violated §§ 206(1) and 206(2) by failing to disclose the subsequent failed attempts to recoup the misappropriated funds and by misleading PFRS about the true value of its assets.  (Compl., ¶¶ 9, 33-34, 61, 64, 66-67, 96-99, 100-101.)

Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 provide that:

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly –

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; . . . .

15 U.S.C. §§ 80b-6(1) and 80b-6(2).

As an investment adviser, MGRA and its principals owed their client -- PFRS – a fiduciary duty defined by the Supreme Court as "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading his clients."  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963) (internal quotation marks and citations omitted). That duty is embodied in Sections 206(1) and 206(2) of the Investment Advisers Act.  *See,*

9

*e.g., SEC v. Washington Inv. Network*, 475 F.3d 392, 404 (D.C. Cir. 2007) (construing section 206 as "prohibit[ing] failures to disclose material information, not just affirmative frauds").

In *Capital Gains*, the Supreme Court was called upon to construe the meaning of the words "fraud" and "deceit" in § 206(2). *Id.* at 181. The appeal arose from the district court's denial of the SEC's request for a preliminary injunction "compelling a registered investment adviser to disclose to his clients" a practice that the SEC claimed operated "as a fraud or deceit" upon the adviser's clients. *Id.* The challenged practice was "known in the trade as 'scalping'" and occurred when an adviser purchased shares of a particular security "shortly before recommending it in [an investment advisory report provided to clients] for long-term investment," and then; after "an increase in market price and the volume of trading of the recommended security within a few days after the distribution of the Report," the adviser would sell his "shares of these securities at a profit" and would "not disclose any aspect of these transactions" to his clients. *Id.* at 183.

The district court based its denial on a "technical" interpretation of the words "fraud" and "deceit" -- an interpretation that required the SEC to "show an intent to injure clients or an actual loss of money to clients." *Id.* at 184. That decision was narrowly affirmed by the Second Circuit Court of Appeals, sitting en banc. *Id.* "The four dissenting judges pointed out that the common-law doctrines of fraud and deceit grew up in a business climate very different from that involved in the sale of securities, and urged a remedial construction of the statute which would encompass [the adviser's challenged] conduct." *Id.* at 185 (internal quotation marks and citation omitted). The Supreme Court "granted certiorari to consider the question of statutory construction because of its importance to the

10

investing public and the financial community."   *Id.*   It defined its task as determining whether Congress "intended the [SEC] to establish fraud and deceit 'in their technical sense,' including intent to injure and actual injury to clients, or whether Congress intended a broad remedial construction of the Act which would encompass nondisclosure of material facts."   *Id.* at 185-86.   Holding that Congress intended the later, the Supreme Court reasoned that "[i]t would defeat the manifest purpose of the Investment Advisers Act of 1940 for us to hold . . . that Congress, in empowering the courts to enjoin any practice which operates 'as a fraud or deceit,' intended to require proof of intent to injure and actual injury to clients."   *Id.* at 192.   Thus, as the Court concluded in *Capital Gains*, the words "fraud" and "deceit" in Section 206(2) of the Advisers Act "encompass nondisclosure of material facts."   *Id.* at 186.

> The statute, in recognition of the adviser's fiduciary relationship to his clients, <u>requires that his advice be disinterested</u>.  To ensure this <u>it empowers the courts to require disclosure of material facts</u>.  It misconstrues the purpose of the statute to confine its application to "dishonest" as opposed "honest" motives.

*Id.* at 201 (emphasis added).

The federal courts have subsequently applied the Supreme Court's holding in *Capital Gains* under circumstances similar to those presented here.  For example, in *SEC v. Washington Investment Network*, 475 F.3d 392 (D.C. Cir. 2007), the SEC brought a civil enforcement action alleging, *inter alia*, violations of §§ 206(1) and (2) of the Advisers Act against an investment advisory company, Washington Investment Network ("WIN") and against one of its co-owners, Robert Radano, for aiding and abetting WIN's violations of §§ 206(1) and (2).  Although Steven Bolla was not an owner, the district court found at a bench trial that he "was the principal figure directing WIN's activities," and had "designated his

11

wife as co-owner of WIN (rather than himself), because [he] was under SEC investigation."
*Id.* at 396.  In June 2000, in an SEC civil enforcement action unrelated to WIN and Radano,
a federal judgment was entered against Steven Bolla and the "SEC issued an order barring
Bolla from the investment advisory business." *Id.* at 398.  It is that bar order issued to Bolla
that gave rise to the SEC's subsequent civil enforcement action against WIN and Radano.
Relevant here, the SEC complaint alleged that the company, WIN, violated §§ 203(f),
206(1) and 206(2) of the Advisers Act by "allowing Bolla to continue to associate with the
firm and failing to disclose Bolla's bar," and that Radano aided and abetted the company,
WIN, in those violations.  *Id.*

After a bench trial, the district court found that WIN had violated §§ 206(1) and 206(2)
of the Advisers Act (as well as § 203(f)) and that Radano had aided and abetted those
violations.  *Id.* at 396, 398.  It "issued an injunction barring WIN and Radano from future
violations" of these sections of the Act and imposed a penalty of $50,000 against WIN and
$15,000 against Radano.  *Id.* at 398.  The district court's decision as to the violations was
affirmed on appeal.  Important here, is the D.C. Circuit's discussion of the primary violation
of section 206 of the Advisers Act.

"The district court found WIN violated both subparagraph (1) and subparagraph (2)
of section 206 when Radano, as a representative of WIN, spoke to Bolla's former clients
without disclosing the bar order.  In the district court's view, Radano hoped to attract these
clients to himself, and therefore he did not want to say anything that would cause these
clients to sever their relationship with WIN." *Id.* at 403.  The D.C. Circuit affirmed, rejecting
WIN's and Radano's argument that "a failure to disclose cannot constitute a fraud in
violation of section 206." *Id.*  It agreed with the SEC argument that, although the Securities

12

Act of 1933 had an express failure-to-disclose provision and the Advisers Act did not, "the two statutory schemes cannot be compared . . . . [b]ecause the Securities Act applies to non-fiduciaries as well as fiduciaries" and thus must be "more specific as regards the implications of failing to disclose material information." *Id.* The Advisers Act, on the other hand, only "concerns itself with investment advisers, who, as fiduciaries, have a duty to disclose material information to clients." *Id.* It found additional support in the Supreme Court's decision in *Capital Gains*, clarifying that "the failure to disclose material information can, in at least some circumstances, provide the basis for a fraud finding under section 206." *Id.*

This Court agrees with the D.C. Circuit's rationale and conclusion that a failure to disclose can constitute a fraud in violation of section 206 of the Adviser's Act:

> the better reading of Section 206 is that it prohibits failures to disclose material information, not just affirmative frauds. This reading is consistent with the fiduciary status of investment advisers in relation to their clients, and it is also more likely to fulfill Congress's general policy of promoting full disclosure in the securities industry.

*Id.* (internal quotation marks and citations omitted). Thus, the SEC's Complaint states a claim that Defendants MGRA and Mayfield breached their fiduciary duty owed to their client and thus violated §§ 206(1) and 206(2) of the Advisers Act.

### 2. The SEC Has Properly Pled Its Claim That Defendants Ackman and Matthews Aided and Abetted MGRA's Violation of §§ 206(1) and 206(2) of Advisers Act

The SEC's Complaint also alleges that Defendants Ackman and Matthews, along with the other remaining Defendants: (1) "knowingly or recklessly provided substantial assistance to MGRA and Mayfield in the commission of these [§§ 206(1) and 206(2)] violations;" (2) "acted with scienter;" and (3) are thus liable for aiding and abetting those

13

violations pursuant to Section 209(f) of the Advisers Act." (Compl., ¶¶ 100-104.) Similar to the SEC complaint at issue in *Washington Investment Network*, the SEC Complaint here seeks to hold Defendants Ackman and Matthews liable on an aider and abettor theory, while holding MGRA and Mayfield liable as the principal violators of Section 206.

This Court rejects each Defendant's arguments that the SEC Complaint fails to allege facts stating a claim of aiding and abetting under Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f). That Section of the Act was added in July 2010 and provides that the SEC may bring a civil action for money penalties against "any person that knowingly or recklessly has aided, abetted, counseled, commanded, induced, or procured a violation of any provision of this subchapter, or of any rule, regulation, or order hereunder" and if proven, "shall be deemed to be in violation of such provision, rule, regulation, or order to the same extent as the person that committed such violation." 15 U.S.C. § 80b-9(f).[1]

As discussed above, the primary violation alleged here is that Defendants MGRA (acting through a principal) and Mayfield violated §§ 206(1) and 206(2) by failing to disclose material facts about the <u>subsequent</u> failed attempts to recoup the misappropriated funds and by misleading PFRS about the true value of its assets. Contrary to Defendants' argument here, the SEC is not "asking this Court to create a new cause of action that stretches the meaning of aiding and abetting beyond the breaking point." (Def. Matthews's Reply at 2; Def. Ackman Reply at 5.) That argument is refuted by the D.C. Circuit Court of Appeals' decision in *Washington Investment Network,* 475 F.3d at 406. There, the D.C. Circuit Court of Appeals affirmed the district court's decision that Radano, a co-owner of

---

[1]This subsection (f) was added by Pub. L. 111-203, effective July 21, 2010.

14

WIN, could be and was "liable on an aider and abettor theory, while holding WIN liable as the principal violator" of Section 206(1) and (2) of the Advisers Act. *Id.* It observed that to be liable as an aider and abettor under sections 206(1) and 206(2), "the SEC must prove knowledge of wrongdoing or a general awareness [on the part of the alleged aider and abettor] that his role was part of an overall activity that was improper." *Id.* (internal quotation marks and citations omitted). Here, the SEC's complaint alleges facts showing that both Defendant Matthews and Defendant Ackman knowingly provided substantial assistance to Defendants MGRA's and Mayfield's primary violation of Section 206 of the Advisers Act.

As to Defendant Matthews, the SEC's aiding and abetting charges are based on his misconduct in 2011 and 2012 -- well within the five-year statute of limitations. Specifically, the SEC Complaint alleges that, in May 2011, he knew that the $3.1 million used to purchase the California Properties was taken without permission from PFRS's Master Account (*id.* at ¶ 69), and discussed ways to and did take steps to substantially assist Defendants MGRA and Mayfield in their breach of fiduciary duty owed to PFRS by taking affirmative steps to recoup the misappropriated funds and by taking affirmative steps to mislead PFRS. These affirmative steps included attempts to sell the California Properties; attempts to adopt cost-cutting measures; and discussions at July and December 2011 PFRS Board meetings about PFRS's portfolio performance where Matthews excluded information about the California Properties' purchase with PFRS funds, the attempts to sell the California Properties or otherwise recoup the $3.1 misappropriated funds, and misled PFRS about its portfolio's performance. (*Id.* at ¶¶ 70, 72-88.)

As to Defendant Ackman, the SEC Complaint alleges that he knew that the $3.1 million in PFRS funds were used to purchase the California Properties; that the properties were titled to MGRA, not PFRS; that PFRS had not approved the purchase; and that Defendants MGRA and Mayfield had not disclosed to PFRS their plan to recoup the misappropriated funds.  (Compl., ¶¶ 47, 51, 59-60, 61, 66.)   It further alleges that Defendant Ackman provided substantial assistance to MGRA's and Mayfield's continued violation of the fiduciary duty of disclosure owed to their client.  The Complaint alleges that he did so  (1) by providing, on a quarterly basis from 2008 through 2011, detailed financial reports to PFRS regarding properties it owned and written notice of all funds transferred to and from its bank accounts that excluded the California Properties or the $3.1 million transfer of PFRS funds used to purchase the California Properties (Compl., ¶ 68); (2) in May 2011 by meeting and discussing with Defendants Matthews, Bass, and Diaz ways to recoup the $3.1 million misappropriated funds in a way that their client would not discover the misappropriation and fire them (*id.* at ¶¶ 69-70); (3) by subsequently taking affirmative steps to recoup the misappropriated funds, i.e., hiring a broker and attempting to sell the California Properties (*id.* at ¶¶ 73-74) and discussing/taking cost-cutting measures (*id.* at ¶¶ 75-76); and (4) in December 2011 by participating in an annual budget presentation to the PFRS Board that excluded information about the purchase of the California Properties with PFRS assets, its declining value, or the failed attempts to sell the California Properties and its impact on PFRS's investment portfolio (*id.* at ¶¶ 79-88).

Relying on *SEC v. Papa*, 555 F.3d 31 (1st Cir. 2009), Defendants argue that "one cannot aid and abet a fraudulent scheme that is already complete," there can be no liability for "aiding and abetting based solely on a failure to disclose" a violation of the securities

laws (the February 2008 misappropriation of $3.1 million) that occurred years earlier, and there can be no aiding and abetting liability based upon the breach of a continuing fiduciary duty to disclose.  (Def. Matthews's Mot. at 9 and Reply at 2, 4; Def. Ackman's Mot. at 8 and Reply at 4, 5.)  These arguments fail on both factual and legal grounds.

First, the Court considers the alleged facts.  Undoubtedly, MGRA violated Section 206 of the Advisers Act when it misappropriated its client's assets in 2008, but its alleged misconduct did not end there.  As asserted in the SEC's Complaint, while the theft of PFRS's $3.1 million may have occurred in February 2008, MGRA's subsequent breach of its fiduciary duty to disclose material facts to its client PFRS was not complete until April 2012 when material facts about the failed attempts to recoup the misappropriated funds and the true value of PFRS's assets were disclosed.  Indeed, MGRA and each of its principals had a fiduciary duty under the Advisers Act to disclose all material facts (and not to mislead) that continued until PFRS fired MGRA on May 3, 2012.

Defendants' reliance on *Papa* is also misplaced.  Unlike *Washington Investment Network*, the decision in *Papa* does not address whether a breach of a fiduciary duty for failing to disclose material facts to a client constitutes a violation under §§ 206(1) or (2) of the Advisers Act, or consider a claim alleging that another individual aided and abetted the charged Section 206 violation.  Rather, the decision in *Papa* was based on the First Circuit's concern that the SEC was attempting, "through the aiding and abetting device," to "*create* new liability under section 10(b)" of the Exchange Act, 15 U.S.C. § 78j, "long after [the challenged] original transactions [involving a one day delay in investing proceeds from the sale of securities into certain mutual funds allegedly resulting in a loss of $4 million], for individuals like appellees otherwise assumed to be *not* liable for those

17

transactions" and "based solely on *general* denials of knowledge of wrongdoing."  *Papa*, 555 F.3d at 37 (emphasis in original).

In *Papa*, the SEC civil complaint arose from circumstances where Putnam Fiduciary Trust Company ("PFTC") was directed, on January 2, 2001, by its clients to sell some assets and to transfer the proceeds from the sales to several mutual funds as soon as possible.  *Id.* at 32.  PFTC made the investments one day later, "causing [its client] to miss a sharp upswing in the markets," and resulting in a loss of almost $4 million.  *Id.* Subsequently, "PFTC officials took a set of steps designed to offset much of the 'loss' to the combined account resulting from the delay and to conceal the misadventure and its repair."  *Id.* at 33.  All of this came to light years later, and the SEC then brought a civil enforcement action against six PFTC officials in 2005.  *Id.*

The SEC complaint alleged "that all six of the PFTC officials had violated section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) (2006), section 10(b) of the Exchange Act, *id.* § 78j, and its implementing regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5 (2008), and that each had aided and abetted PFTC's uncharged primary violation of section 10(b) and Rule 10b-5, thus violating section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e)."  *Id.* at 34.  All six PFTC officials filed Rule 12(b)(6) motions to dismiss.  The district court denied some of the motions and granted others.  The motions as to three PFTC officials -- Durgarian, McCracken, and Hogan -- were denied "in light of their actions in ordering and carrying out the pertinent transactions," i.e., the steps designed to offset the loss and "to conceal the misadventure and its repair."  *Id.*  The motions as to the three other PFTC officials  -- Papa, Crain, and Childs  --  were granted, and the SEC appealed the district court's

18

decision to dismiss the aiding and abetting claims against Papa, Crain and Childs." *Id.* at 35.

The SEC argued on appeal that these three PFTC officials -- Papa, Crain, and Childs -- "aided and abetted PFTC's uncharged primary violations under sections 10b, as implemented by Rule 10b-5, by signing the 2002 and 2003 audit letters [stating that they were unaware of any uncorrected errors, frauds or illegal acts attributable to PFTC that had affected its clients] while knowing that the allegedly wrongful . . . transactions and accounting adjustments [made after the one day delay] had occurred and not been disclosed." *Id.* In determining "*what* wrong" these defendants were charged with aiding and abetting, the *Papa* court first observed that it could not be the original delay that resulted in the $4 million loss or the subsequent coverup transactions because these transactions "were completed in or around January 2001, long before the audit letters" that Papa, Crain, and Childs signed in 2002 and 2003, and "[o]ne cannot aid and abet a fraudulent scheme that is already complete." *Id.* at 36.

The *Papa* court then considered the SEC's argument "that, given PFTC's continuing duty as a fiduciary to [disclose the original loss and the subsequent partial transfer of loss to other clients] . . . the appellees' audit letters 'assisted' PFTC in continuing to breach its duty because . . . accurate answers to the audit letters would have revealed PFTC's conduct to auditors," and PFTC's clients. *Id.* at 37. Critical to the Court's analysis here, the *Papa* court observed that "[a]n underlying necessary premise is that the non-disclosure was not only a breach of a fiduciary duty but also a violation of section 10(b), so invoking SEC jurisdiction," and further observing that it was "not crystal clear in this case that the non-disclosures themselves constitute a securities law violation." *Id.* The *Papa* court was

19

concerned that the SEC, "through the aiding and abetting device, . . . would *create* new liability under section 10(b), long after the original transactions, for individuals like appellees otherwise assumed to be *not* liable for those transactions," and "based solely on *general* denials of knowledge of wrongdoing." *Id.* (emphasis in original).

*Papa* is distinguishable.  First, the D.C. Circuit observed in *Washington Investment Network* that non-disclosures of material facts can constitute a violation of §§ 206(1) or (2) of the Advisers Act.  Thus, finding that the SEC has stated a claim of aiding and abetting such a violation of the Advisers Act here will not create new liability under Section 206 of that Act.  Second, unlike in *Papa*, Defendants Matthews's and Ackman's alleged aiding and abetting conduct ties them to an ongoing fraudulent coverup scheme, not a completed one.

For all the above reasons, the SEC has properly pled a claim that Defendants Ackman and Matthews aided and abetted MGRA's and Mayfield's violation of §§ 206(1) and (2) of the Advisers Act.

### B.  The SEC's Aiding and Abetting Claims Are Timely

Defendants' additional argument -- that the SEC's claims are barred by the relevant five-year statute of limitations -- is also rejected.  As discussed above, the SEC's aiding and abetting claims at issue here are not based on the 2008 misappropriation of client assets.  Rather, they are based on subsequent conduct, falling within the statute of limitations period, that is addressed above.

**IV.  Conclusion**

For the above-stated reasons, Defendants' motions to dismiss are DENIED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  November 13, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 13, 2013, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol A. Hemeyer